WALRAVEN and another, Respondents, vs. SPRAGUE, WARNER & COMPANY and others, Appellants.

*June 4—June 20, 1940.*

For the appellants there were briefs by *Cavanagh, Stephenson & Mittelstaed* of Kenosha, and *Bell, Boyd & Marshall* of Chicago, Illinois, attorneys, and *Earl K. Schiek* of Chicago of counsel, and oral argument by *Mr. Roy L. Stephenson* and *Mr. Schiek*.

For the respondents there were briefs by *Taylor, Phillips & Taylor* of Kenosha, and oral argument by *Matt J. Taylor* and *David L. Phillips*.

FRITZ, J.   The defendants' principal contention on this appeal is that the court erred in failing to grant their motion for a directed verdict on the ground that the evidence does not admit of a finding that the cans of crab meat and tuna fish in question contained any contaminated or poisonous substance when the cans were sold by defendants.   There was evidence that two 6 or 7-ounce cans of tuna fish and a like-sized can of crab meat, which Sprague, Warner & Company had sold to the Jackson Grocery Company, were purchased from it by Mrs. Virgil Glaves on April 16, 1936. That evening she took these cans, together with a package of macaroni, a large stalk of celery, a pint of commercial mayonnaise dressing in a quart jar, and a half pint of homemade mayonnaise dressing in a pint glass jar, to the home of her sister, Mrs. Stone.   The half pint was the remainder of some mayonnaise dressing made by Mrs. Glaves about six days prior thereto, which contained eggs, flour, mustard, vinegar, and water.   The next morning Mrs. Stone used the articles of food in mixing a salad.   She cooked the macaroni and cooled it in a colander with running cold water.   With a knife she cut the celery, and also the fish and crab meat into small pieces, and picked the bones and gristle out of the latter by hand.   She took mayonnaise dressing out of each of the jars with a spoon, which she used in mixing the salad.   When

it was completed at 10 o'clock, she put it in a green crock, covered with wax paper, and at 12 o'clock it was taken to Mrs. Glaves' home and put in her refrigerator, in which the temperature was above freezing. Some unused macaroni and mayonnaise dressing in each jar were also returned to Mrs. Glaves. At 3:30 p. m. the salad was placed on plates with lettuce, and between 4 or 5 p. m. it, together with pickles and rolls, coffee, cream, angel-food cake, and icebox cookies, was served by Mrs. Glaves to six adult guests, including the plaintiff, Jennie Walraven. All of them, including Mrs. Glaves, ate the salad, and her little son also ate some. All excepting Mrs. Glaves became sick that night, and by 7:30 p. m. Jennie Walraven was very ill. Three other children at the party, who had eaten some of the other food but none of the salad, did not become sick. The remaining macaroni and mayonnaise dressing, the cookies, butter, and cream were used up during the following week without any sickness resulting; but the salad was thrown away.

The evidence warranted finding that Mrs. Walraven's illness was probably caused by some contaminated or poisonous substance in the salad. However, no examination was made by any chemist or bacteriologist of the fish or crab meat, or the cans, or the remnant of the salad or other food, or of the vomit, feces, urine, or blood of any of the persons who had partaken thereof. Plaintiffs' attorney purchased and submitted a can of the same brand of fish and crab meat to the city chemist of Kenosha, for an examination, but no defect was found therein, and there does not appear to have been any defective condition in any other can of these foods which was handled by the defendants. On the other hand, it appears without dispute that the labels on the three cans sold to Mrs. Glaves were bright; that the cans had no dent, bulge, or apparent defect or injury; that when opened the appearance and odor of the contents seemed to be all right; and that the appearance, odor, and taste of the salad was likewise

all right when it was served. There is no direct evidence whatsoever of the presence or existence of any infected, contaminated, or poisonous substance in the cans at the time they were opened by Mrs. Stone, or in any can of such food sold by the defendants, or of any circumstances tending to establish that conclusion or from which it can reasonably be inferred.

As the trial court concluded, in ordering judgment on the verdict, there is no testimony in the case that either directly or by reasonable inference supports the claim that the tuna fish or crab meat was contaminated, and was in such condition prior to the opening of the cans, excepting the conclusion to that effect testified to by an expert witness called by the plaintiffs. He had had particular training in bacteriological chemistry and toxicology, and as a physician specialized in pathology and diagnosis. In his opinion plaintiff's illness was caused by eating crab meat and tuna fish, which had become contaminated prior to the preparation of the salad. He believed the contamination was due to bacteria or to toxins produced by bacterial growth, or to residual toxins after the destruction of the bacteria themselves by the heat treatment in canning. He considered it bacterial rather than nonbacterial poison, because the symptoms of the food poisoning did not point to heavy metal poisoning. He incriminated the tuna fish or crab meat, instead of some other food or ingredient in the salad, because all who had eaten the salad, excepting Mrs. Glaves, had the symptoms of food poisoning, but the three children, who had eaten every other product, except the salad, did so without any ill effect; and the remnants of the ingredients (*i. e.,* the mayonnaise dressing and macaroni) in the salad, which were later eaten independently of the salad had not caused any disturbance. He did not consider the celery incriminated because it was fresh and composed mostly of cellulose, which was very tough and therefore an extremely poor medium for the growth of con-

taminated substances or bacteria. Although the crab meat and tuna fish might have been contaminated before or after the cans were opened, he believed contamination after they were opened would not have been sufficient to produce the poisoning because of several theories which he stated.

Upon the basis of but that testimony as to the witness' conclusions, plaintiffs contend that the evidence warrants finding that the fish or crab meat in one of the cans originally carried bacteria which, although killed by the heat treatment in canning, left toxins which caused Mrs. Walraven's poisoning; and that therefore the jury was warranted in finding that the cans contained contaminated and poisonous substance at the time of the sale to Mrs. Glaves. On the other hand, the expert witness' conclusions, upon which plaintiffs base these contentions, are in conflict with the opinion evidence of two qualified expert witnesses called by the defendants. No useful purpose will be served by stating the testimony or discussing the relative weight or merits thereof, excepting to note that the following appeared therefrom. The contamination or toxins which were in the salad could have come from several other sources than the fish or crab meat or the cans. Such ingredients in the salad as celery, mayonnaise dressing, and macaroni, and knives, spoons, dishes, and hands used in preparing the salad, are known to be not sterile, but actually harbor bacteria which cause human ailments. Mayonnaise dressing, especially when homemade, and macaroni when boiled and wet, and particularly the salad, which was a mixture of these articles of food, and the fish and crab meat, constituted an excellent culture medium for the bacterial growth. Commercially canned goods are subjected to heat processing which is generally sufficient to kill any bacteria; these bacteria are not killed by refrigeration at the temperature used in this case, but may actually multiply in a few hours if the refrigeration is not perfect. The period of six hours which elapsed between the mixing and

the eating of the salad was sufficient time for the incubation and increase of bacteria so as to contaminate the salad and render it poisonous. For these and other reasons, defendants' expert witnesses concluded that the source of the contaminating bacteria was not some substance which was in the cans at the time they were opened; but that the source thereof was very likely the celery, the homemade mayonnaise dressing, or the person who made the salad. Excepting in so far as their conclusions were based in part by these witnesses upon such direct evidence as that there was no dent, bulge, or defective appearance in the cans or any bad odor or appearance in the contents thereof when they were opened, and that the fish and crab meat did not have any bad odor, taste, or appearance when it was eaten in the salad, the conclusions are subject to the objections that they are of no sufficient probative value because they are based upon but other opinions or conclusions of the witnesses, instead of being based, as necessary to sustain an affirmative finding, upon facts proven by direct evidence or circumstances which are reasonably inferable from such evidence. This court has held repeatedly that "a jury cannot properly be allowed to determine disputed questions of fact from mere conjecture. There must be some direct evidence of the fact, or evidence tending to establish circumstances from which a jury would be warranted in saying that the inferences therefrom clearly preponderate in favor of the existence of the fact, else the question should not go to the jury for determination at all." *Hyer v. Janesville,* 101 Wis. 371, 376, 377, 77 N. W. 729.

The requirements prescribed by these rules are applicable and controlling in passing upon the sufficiency, as evidence to sustain the verdict, of the ultimate conclusion testified to by solely plaintiffs' expert witness that there was a contaminating or poisonous substance in the cans at the time they were opened. There is no direct evidence that there was in fact any bacteria, or any toxin produced thereby or therefrom in the

cans at the time they were opened, as plaintiffs' witness concluded. Neither was there any direct evidence of any such circumstances as that there was some dent, bulge, or defective appearance in the cans or any bad taste, odor, or appearance as to their contents, from which it could reasonably be inferred that there was such bacteria or toxin in the cans at the time in question. On the contrary, instead of having some fact or circumstance so established by direct evidence as the factual basis for the conclusion to that effect, the basis relied upon is but a series of conclusions, each of which is in turn deduced from but other conclusions of plaintiffs' expert witness. In view of this situation, his testimony as to his ultimate conclusion cannot be considered of sufficient probative value to sustain a verdict based thereon. As this court said in *Dreher v. United Commercial Travelers,* 173 Wis. 173, 179, 180 N. W. 815,—

"To endow opinion evidence with probative value it must be based on facts proven or assumed, sufficient to enable the expert to form an intelligent opinion. The opinion must be an intelligent and reasonable conclusion based on a given state of facts and be such as reason and experience have shown to be a probable resulting consequence of the facts proved. The basis of the conclusion cannot be deduced or inferred from the conclusion itself. In other words, the opinion of the expert does not constitute proof of the existence of the facts necessary to support the opinion. See *Bucher v. Wis. Cent. R. Co.* 139 Wis. 597, 120 N. W. 518, where many cases are reviewed."

In relation to the crucial issue as to whether there was some contamination or poison in the cans when they were sold by the defendants, there is a material and fatal distinction between the facts under the evidence herein and the facts under the evidence in *Doherty v. S. S. Kresge Co.* 227 Wis. 661, 278 N. W. 437. In that case the turkey meat in question was prepared by and remained in the defendant's custody and control, ready for consumption by its customers, including plain-

tiff's wife, until it was served to them by the defendant on its premises. Furthermore, there was proof that the meat had a peculiar taste and was unwholesome when it was so served; that three others who had partaken thereof at defendant's store had become ill the same day; and that two others had refused to eat it when served to them by the defendant. Thus there clearly was ample proof to establish that the meat was contaminated when defendant sold and served it to the plaintiff's wife. It was not consumed, as in this case, after removal by the purchaser from the defendant's possession in a sealed container; and after being mixed in a salad with ingredients which are known to harbor bacteria and render the mixture an excellent culture medium for their increase, and thereupon left during a period of time and under conditions which could be considered sufficient to contaminate the salad and render it poisonous by reason of the bacterial increase. In view of the evidence as to these facts and circumstances, the possibility, if any, that there was some contaminated or poisonous substance in the cans when they were opened, is at best so remote, and the testimony and conclusion to that effect is so highly speculative and conjectural, that the verdict, which is based solely thereon, cannot be sustained. As we said in *Creamery Package Mfg. Co. v. Industrial Comm.* 211 Wis. 326, 330, 248 N. W. 140,—

"Mere possibilities leave the solution of an issue of fact in the field of conjecture and speculation to such an extent as to afford no basis for inferences to a reasonable certainty, and in the absence of at least such inferences there is no sufficient basis for a finding of fact. It will not do to reach a conclusion in favor of the party on whom the burden of proof rests by merely theorizing and conjecturing. There must at least be sufficient evidence to remove the question from the realm of conjecture."

See also *Loomis v. Industrial Comm.* 216 Wis. 202, 256 N. W. 693; *Matuschka v. Murphy,* 173 Wis. 484, 180 N. W.

821; *Enders v. Sinclair Refining Co.* 220 Wis. 254, 263 N. W. 568, 265 N. W. 67; *Bruins v. Brandon Canning Co.* 216 Wis. 387, 402, 257 N. W. 35.

Because of the absence of evidence which can be held sufficient to establish a contaminated or poisonous condition of the fish or crab meat when it was sold by defendants, and, on the other hand, because of the evidence as to facts and circumstances, including the time which elapsed, by reason of which these articles of food and the salad may have become contaminated subsequently, there is in point the statement in *Bowman v. Woodway Stores, Inc.,* 345 Ill. 110, 116, 177 N. E. 727, to wit:

"The evidence shows that there are numerous ways in which milk and other food may become contaminated after exposure and bacterial infection result therefrom. The can of milk in question had been open for more than four hours before it was examined by the attending physician. If, after it was diluted, there was contamination of the mixture, an independent efficient cause existed which could produce infection, but had no pertinency to the condition of the milk when it was sold. . . . The burden was upon the defendant in error to establish by competent evidence the poisonous or unwholesome condition of the milk when the can was opened. Evidence of later contamination would not be responsive to the allegations of the declaration and would create no liability against the plaintiff in error."

See also *Cudahy Packing Co. v. McPhail,* 170 Miss. 508, 155 So. 163; *Cudahy Packing Co. v. Baskin,* 170 Miss. 834, 155 So. 217.

It follows that the court erred in denying defendants' motions for a directed verdict in their favor and likewise in denying their motions for judgment dismissing the complaint, notwithstanding the verdict.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment dismissing the complaint.