DOHERTY, Respondent, vs. S. S. KRESGE COMPANY, Appellant. [Two cases.]

*February 15—May 17, 1938.*

662

For the appellant there were briefs by *Powell & Sprowls* of Superior, and oral argument by *John S. Sprowls.*

For the respondent there were briefs by *Hanitch, Johnson, Fritschler & Barstow* of Superior, and oral argument by *John C. Fritschler.*

The following opinion was filed March 15, 1938:

FAIRCHILD, J.   Plaintiff contends, (1) that the evidence sustains the finding that deceased died because of eating unwholesome food served to her in defendant's restaurant; (2) that upon these facts the defendant under the Minnesota pure-food law sustains a statutory liability in tort, independently of negligence, by reason of having served or sold unwholesome food; or (3) that the serving of the food constituted a sale of it and that there was a breach of warranty under sec. 8390, Mason's Minn. Stats., part of the Uniform Sales Act; that there was under that section an implied warranty that food sold was fit for the purpose intended.

In the view the court takes it will be unnecessary to consider whether the transaction constituted a sale, or whether, if it did, a breach of warranty may be made the basis for an

action under sec. 9657, Mason's Minn. Stats., for death by wrongful act, a proposition we think open to considerable doubt.

We must now determine whether the evidence is of such weight and character as to support a verdict by the jury that the death of Mrs. Doherty resulted from the defendant's serving her unwholesome or deleterious food, resolving all reasonable inferences therefrom in favor of the finding. As was said in *Creamery Package Mfg. Co. v. Industrial Comm.* 211 Wis. 326, 330, 248 N. W. 140, a preponderance of mere possibilities is not the equivalent of a preponderance of probabilities, and mere possibilities leave the solution of an issue of fact in the field of conjecture. The defendant, among other assignments of error, urges that the jury's answer to the question relating to the serving and eating of unwholesome and deleterious food is contrary to the evidence when weighed by the proper rule, and that the finding by the jury that the illness and death were caused by unwholesome food sold to her by the defendant is also not supported by any credible evidence. The evidence may be divided into two classes: First, scientific or expert testimony, and, second, the lay testimony, including history and surrounding circumstances. The expert testimony fails to establish the reasonable probability of death by infection due to impure food and, considered by itself, furnishes no competent evidence to remove the case from the realm of conjecture. The experts were not partisan, and each gave all the help he could, but in the absence of an opportunity for a bacteriological test, as suggested by Dr. Clark, elements enabling the doctor to make a definite finding on food poisoning were lacking. There are possibilities of the source of the illness lying in one of several causes, but this evidence does not point to fault on defendant's part with sufficient positiveness of its being a probability, as distinguished from possibility, to warrant granting judgment to plaintiff. The

testimony of all the doctors and scientists (witness for plaintiff as well as witnesses for defendant) is to the effect that, judging from symptoms, her illness might have been caused either by "food poison" or "intestinal flu." Dr. O'Leary, the attending physician, testified in substance:

"In gastroenteritis you get symptoms both from stomach and intestinal tract. I would call it a syndrome. That means a group of symptoms. It is a condition that you find many times without a cause. Gastroenteritis does not suggest the cause, that is the result, the condition. That condition would not particularly suggest any history of food poison any more than it would suggest so-called intestinal flu."

Dr. O'Leary's testimony shows an assumption by him that food was the cause of the illness. This assumption was based on a statement in an answer to a question by him to the patient. He also testified that after asking her the question, "I never thought of it again. It didn't interest me. Wouldn't change my treatment." This leaves the record so far as the doctors are concerned void of evidence on which to base a finding as to which of two at least or possibly three causes should be charged with the result. But considering the testimony of the lay witnesses as to their experiences on and about the time that Mrs. Doherty became ill, we find that four people who ate at defendant's restaurant displayed similar symptoms; while this, as defendant argues, may leave some doubt as to the source of the infection because the symptoms of flu and of food infection are similar, and because of the presence of flu in the vicinity of the residence of the witnesses, it does not follow that the proposition that the food is the source of the difficulty is not reasonably probable.

As pointed out by Dr. Hirschbeck, the history is of importance, and, in the circumstances detailed, there is evidence pointing to the food as the source of the difficulty. The doctor testified that it would be folly not to give consid-

ʹeration to the history, including whether or not the patient
had eaten in a place that she was not accustomed to eat, and
whether or not she and other persons who had eaten in the
same place had been ill, while other members of the family
who did not eat at the place were not ill. Dr. O'Leary testi-
fied:

"Outside of history I cannot say what caused it [Mrs.
Doherty's illness and death]. Without the history it would
have gone on record 'cause unknown.' "

The case may be a close one. It does raise questions over
which reasonable minds may differ, but we cannot say in
view of the facts disclosed by the lay witnesses, supple-
mented and illuminated as they are by the testimony of the
medical men, that a jury question did not exist as to the
food being the source of the infection.

It is plain upon this record that there is no evidence of ac-
tual negligence in selection, preparation, or serving of food
by defendant's restaurant, and the question is whether under
the laws of Minnesota anything more is required to sus-
tain a recovery than that unwholesome food was sold and
that damage resulted. Sec. 3789, Mason's Minn. Stats., con-
stituting a portion of the Pure Food Act reads as follows:

"It shall be unlawful for any person to manufacture, sell,
use, transport, offer for sale or transportation, or have in
possession with intent to use, sell or transport, any article of
food which is adulterated, . . . unwholesome, poisonous
or deleterious within the meaning of this act."

*Meshbesher v. Channellene Oil & Mfg. Co.* 107 Minn. 104,
119 N. W. 428, was an action involving the pure-food stat-
ute. The Minnesota court considered that the allegations of
the complaint failed to state a cause of action except for
breach of the statute. In other words, there were no inde-
pendent allegations of negligence. The court held that the
complaint and findings of fact of the trial court brought the
cause within the rule that where a statute for the protection

or benefit of individuals prohibits a person from doing an act or imposes a duty upon him if he disobeys the prohibition or neglects to perform the duty, he is liable to those for whose protection the statute was enacted for damages resulting proximately from such disobedience or neglect. It was there said:

"The fact that the trial court did not find that the defendant knew that the oil was impure does not affect the question of its liability; for it was bound to know whether the article, which it sold to be retailed to the customers of the purchaser . . . was sound, wholesome, and complied with the statute."

We construe that decision as holding that the liability of defendant for selling unwholesome food exists independently of any showing of actual negligence. The statute is apparently held to create a species of statutory tort arising out of a failure, however innocent, to comply with a specific mandate of a statute designed to promote public health and safety. Nor do we see anything in *Swenson v. Purity Baking Co.* 183 Minn. 289, 236 N. W. 310, which militates against this conclusion. That was a case involving a claim for damages alleged to have resulted when plaintiff, about to eat a slice of bread, saw a dead larva imbedded in the bread. The court does say that defendant took every precaution to protect the wholesomeness of its bread, and states that defendant was not an insurer against the unfortunate circumstance thus occurring. That is quite a different situation from the one now before us. In the *Swenson Case* the plaintiff was not injured by eating, but sought to recover for mental and nervous results from seeing foreign matter in the bread. It is understandable that legislative intent would be not to impose an insurer's liability in favor of a person shocked and would be to limit the liability to apply solely to persons actually injured by consuming impure or deleterious food.

We are of the opinion that the law of Minnesota has created a tort liability in favor of a person injured by the eating of unwholesome, poisonous, or deleterious food sold to him; that under that law this liability exists independently of any showing of culpability other than a showing of a violation of the statute. We thus reach the conclusion that death resulting as found by the jury in the case at bar under the Minnesota law constitutes death by wrongful act and creates a cause of action under sec. 9657. Had deceased lived, she could have maintained an action for damages resulting to her from her illness. Having died, this cause of action for wrongful death is in the statutory beneficiaries.

The result reached makes it unnecessary to examine the question as to whether there is any cause of action for breach of warranty which survives, or may be the basis of an action for wrongful death.

The point that the damages in the administrator's action are excessive is ruled against defendant by *Anderson v. Anderson,* 188 Minn. 602, 248 N. W. 35. There is no showing here of any passion or prejudice on the part of the jurors. Under the Minnesota statute, the amount recoverable as damages includes the pecuniary loss not only of the husband, but that sustained by the five children, aged four, fifteen, nineteen, twenty-two, and twenty-five. In the personal action, the damages were stipulated and are recoverable by the husband. *Fowler v. First Minnesota T. Co.* 184 Minn. 82, 237 N. W. 846.

*By the Court.*—Judgments affirmed.

A motion for a rehearing was denied, with $25 costs in one case, on May 17, 1938.